1
2
3
4
5
6

7              IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                     SAN JOSE DIVISION

10

11   INSOOK KIM, individually and as          No. C 09-00025 RS
     Successor in Interest for AZIZ R. JAMES,
12   Decedent,
                                              **ORDER (1) DENYING PLAINTIFF'S**
13                                            **MOTION FOR SUMMARY**
                     Plaintiff,               **JUDGMENT AND (2) GRANTING**
14         v.                                 **DEFENDANTS' MOTION FOR**
                                              **SUMMARY JUDGMENT**
15
     CITY OF SANTA CLARA; SCOTT
16   FITZGERALD; TROY JOHNSON; GARY
     HOSMAN; PHIL COOKE; DIANE
17   BISHOP; and DOES 1 to 50, inclusive,

18
                     Defendants.
19
     _____/
20

21        This lawsuit arises from the death of Aziz R. James, who was shot by members of the Police

22   Department of defendant City of Santa Clara ("City").  Based on the events surrounding James's

23   death, his mother Insook Kim filed a complaint against the City and four City police officers

24   advancing four claims for relief based on violations of 42 U.S.C. §1983 and the Fourth and

25   Fourteenth Amendments to the United States Constitution.  Specifically, the four claims allege (1)

26   unlawful and excessive force; (2) denial of medical treatment; (3) unconstitutional policies and

27   practices by the City; and (4) deprivation of familial relationship.  Kim now moves for partial

28   summary judgment as to Officers Gary Hosman, Scott Fitzgerald, and Troy Johnson with respect to

*E-Filed 05/19/2010*

**United States District Court**
For the Northern District of California

her first, second, and fourth claims.  Defendants have cross-moved for summary judgment on all claims.[1]  For the reasons stated below, Kim's motion for partial summary judgment is denied and defendants' motion for summary judgment is granted as to all claims.

<p style="text-align:center">I.      BACKGROUND</p>

The undisputed facts of this case are as follows.  James attended a party at 2548 Crystal Drive in Santa Clara, California, on April 4, 2008.  Around 3:30 a.m., his behavior became erratic.  An altercation with another partygoer named Igor Katz ensued, during which James stabbed Katz with a 6-inch knife and then fled by jumping through a window, breaking the glass in the process.  James then ran across the yard to a neighbor's house, located at 2554 Crystal Drive and crashed through a second glass window to gain entry.

Four other partygoers then entered 2554 Crystal Drive to talk to James and try to calm him down.  Inside the house, they overheard James talking on the phone in one of the bedrooms and saying that people at the party were trying to kill him.  When they entered the bedroom, James lunged at one of them, who was named Casey Gowan, and stabbed him in the shoulder.  The four partygoers then fled the premises.

Around the same time, officers from the City's Police Department, including defendants Fitzgerald and Hosman, appeared on the scene in response to numerous 911 calls and learned that James had stabbed Katz and Gowan and had gone into hiding at 2554 Crystal Drive.  The resident of the home where James had taken refuge provided his keys to the officers and gave them permission to enter the house.  At around 4:40 a.m., Hosman, Fitzgerald, and two other officers, along with Fitzgerald's K-9 unit, knocked and announced outside the house, waited 10-15 seconds with no response, and then entered the house using the keys.  In the course of searching and securing the premises, one of the officers observed bloodstains on an interior door, a wall, and on the floor.  About 20 minutes after the officers' entry, the canine alerted to the closed bedroom door where

---

[1]  Both sides filed their motions for summary judgment prior to the date when Kim, with the Court's permission, filed her second amended complaint.  In the absence from any indication otherwise from the parties, it is presumed that the arguments for and against summary judgment carry over to the new version of the complaint.

1   James was hiding. Fitzgerald tried to start a dialogue through the door with James but received no

2   response.

3           While Fitzgerald tried to establish communication, two other officers went to a patio that

4   adjoined the bedroom and observed James through a window. James was prostrate on the floor with

5   his back against the bed and both feet propped against the door. The officers were unable to see his

6   hands. They instructed him to show his hands but obtained no response. After several commands,

7   James turned slowly to look at them with a blank, glassy-eyed stare, but he made no move to

8   comply with their orders, or otherwise to respond.

9           Meanwhile, defendant Hosman, who was outside supervising the scene, called defendant

10  Phil Cooke, a commander of the Police Department's Special Response Team ("SRT"). Cooke,

11  who was off-duty at home, discussed the situation with Hosman to decide whether an official SRT

12  call-out was warranted under the circumstances. They decided the answer was no, since at that time

13  James was simply unresponsive to the officers, as opposed to offering active resistance. The

14  decision was also influenced by the fact that Fitzgerald and at least one of the other officers (not a

15  party to this action) were SRT members. Around this time, defendant Johnson, another SRT

16  member, appeared on the scene with a Sage launcher[2] and breaching tools taken from the

17  department's SRT supplies, which he had been instructed to bring.

18          Hosman and his team decided to deploy the Sage launcher through the bedroom window, to

19  see if they could distract James and get him away from the door. If this proved ineffective, the

20  contingency plan was for Fitzgerald and fellow officers to break down the door and deploy the K-9

21  unit to take James into custody. These plans were made on the assumption that James was

22  potentially armed with the knife he had used to stab Katz and Gowan. The first plan was put into

23  action, and after repeated warnings, officers at the window shot James in the legs three times with

24  rubber bullets from the Sage launcher. To their surprise, he proved entirely unresponsive, and

25  Hosman halted the Sage deployment.

26

27  [2] The Sage launcher shoots rubber bullets, which are not considered lethal.

28

1   Once the Sage plan was halted, Johnson, who had by this time joined Fitzgerald with his

2   service dog and a fellow officer outside the bedroom door, began to batter the door in accordance

3   with the contingency plan.  After several impacts from Johnson's battering ram, the door broke.

4   Fitzgerald gave repeated commands to James and, receiving no response, deployed the dog to

5   subdue him by biting his legs.  James responded by attacking the dog frantically, kicking him and

6   stabbing him repeatedly with his concealed knife.  The dog then retreated, and James next lunged

7   toward Fitzgerald and Johnson with the knife, from a distance of 2-3 feet.  The two officers fired on

8   James, striking him eight times.  One of the shots entered James's head and was immediately lethal.

9   James fell over with his knife clenched in his fist.  Shortly thereafter, medical personnel arrived on

10  the scene and pronounced James dead.

11  Based on these events, James's mother and successor in interest, plaintiff Kim, sued the

12  City, Fitzgerald, Johnson, Hosman, Cooke, and defendant Diane Bishop, who was not at the scene

13  but was the captain in charge of the patrol division at the time of these events.  Kim now moves for

14  partial summary judgment in part and defendants move for summary judgment on all claims.

II.      LEGAL STANDARDS

15

16  A.    Summary Judgment

17  Summary judgment is proper "if the pleadings and admissions on file, together with the

18  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

19  party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The purpose of summary

20  judgment "is to isolate and dispose of factually unsupported claims or defenses."  *Celotex v. Catrett*,

21  477 U.S. 317, 323-324 (1986).

22  The moving party "always bears the initial responsibility of informing the district court of

23  the basis for its motion, and identifying those portions of 'the pleadings and admissions on file,

24  together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of

25  material fact."  *Id.* at 323.  If the moving party meets this burden, then the non-moving party "must

26  set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The

27  non-moving party cannot defeat the moving party's properly supported motion for summary

28

*United States District Court*
For the Northern District of California

No. C 09-00025 RS
ORDER

4

United States District Court
For the Northern District of California

1   judgment simply by alleging some factual dispute between the parties.  To preclude the entry of

2   summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might

3   affect the outcome of the suit under the governing law. . . .  Factual disputes that are irrelevant or

4   unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

5   The opposing party "must do more than simply show that there is some metaphysical doubt

6   as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

7   "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

8   evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*,

9   477 U.S. at 248.  Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of

10  fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at

11  587.

12  B.   Qualified Immunity

13  These general summary judgment standards are subject to some additional refinement in

14  connection with the concept of qualified immunity.  Qualified immunity is the doctrine by which

15  "government officials performing discretionary functions generally are shielded from liability for

16  civil damages insofar as their conduct does not violate clearly established statutory or constitutional

17  rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

18  (1982).  "Through application of the qualified immunity doctrine, public servants avoid the general

19  costs of subjecting officials to the costs of trial—distraction of officials from their governmental

20  duties, inhibition of discretionary action, and deterrence of able people from public service."  *V-1*

21  *Oil Co. v. Smith*, 114 F.3d 854, 857 (9th Cir. 1997) (internal citations omitted).  The immunity is

22  "immunity from suit rather than a mere defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 526

23  (1985).

24  In *Saucier v. Katz*, the Supreme Court mandated a two-step sequence for resolving a

25  qualified immunity question: the "constitutional inquiry" and the "qualified immunity inquiry."

26  533 U.S. 194, 201(2001).  The "constitutional inquiry" asks whether, when taken in the light most

27  favorable to the non-moving party, the facts alleged show that the official's conduct violated a

28

No. C 09-00025 RS
ORDER

5

constitutional right.  *Id.*  If so, a court turns to the "qualified immunity inquiry" and asks if the right

was clearly established at the relevant time.  *Id.* at 201-02.  In *Pearson v. Callahan*, the Supreme

Court clarified that the *Saucier* procedure is not an inflexible requirement; rather, judges are

"permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular case at

hand."  129 S. Ct. 808, 818 (2009).

### III.   DISCUSSION

All four of Kim's claims against defendants are based on 42 U.S.C. § 1983, which provides

in pertinent part:  "Every person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to

the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

be liable to the party injured[.]"  In opposition, defendants raise qualified immunity, arguing that

they cannot be subject to civil liability under § 1983.  Qualified immunity, if proved, serves as a full

defense to § 1983 claims against government officers and "'is designed to protect "all but the

plainly incompetent or those who knowingly violate the law.'"  *Morse v. Frederick*, 551 U.S. 393,

429 (2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341(1986)).  In accordance with *Saucier* and

*Pearson*, the first inquiry here is whether the alleged facts, when viewed in the light most favorable

to Kim, show that the police officers' conduct violated a constitutional right belonging to James.

A.    <u>Unlawful and Excessive Force</u>

Kim first alleges that James's rights under the Fourth Amendment were violated because

defendants used unlawful and excessive force during the events described above.  In executing a

search and seizure under the Fourth Amendment, officers may take reasonable action to secure the

premises and to ensure their own safety and the efficacy of the search.  *Muehler v. Mena*, 544 U.S.

93, 98-100 (2005).  The test of reasonableness under the Fourth Amendment is an objective one.

*Graham v. Connor*, 490 U.S. 386, 397 (1989) (addressing the reasonableness of a seizure of the

person); *Long v. City & County of Honolulu*, 511 F.3d 901, 905 (9th Cir. 2007) ("In a Fourth

Amendment excessive force case, defendants can still win on summary judgment if the district court

**United States District Court**
For the Northern District of California

concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."). Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time. *Mena*, 544 U.S. at 100. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

*Saucier* explains that the first-prong inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is distinct from an inquiry into the *merits* of the excessive force claim. *Saucier*, 533 U.S. at 204-05. If an officer is mistaken regarding amount of force that is legal, but such mistake is reasonable, the officer is entitled to immunity defense. *Id.* "'[T]he reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.'" *Id.* at 205 (quoting *Graham*, 490 U.S. at 396). Consequently, the inquiry in this case is whether the defendant officers were reasonable in their judgment about the proper amount of force to use. *See Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002) (observing that "even though the officers might have had 'less intrusive alternatives available to them,' and perhaps under departmental guidelines should have 'developed a tactical plan' instead of attempting an immediate seizure, police officers 'need not avail themselves of the least intrusive means of responding' and need only act 'within that range of conduct we identify as reasonable'" (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

While Kim does not appear to contest that defendants Fitzgerald and Johnson reacted reasonably by firing their service weapons when James lunged at them with a knife from 2-3 feet away, she nonetheless argues that they should never have gotten themselves into a situation where such action was necessary. Rather, she contends the officers responding to the scene used excessive force, from an objective perspective, because they should have deployed an SRT team with expertise in hostage negotiations, rather than barging into the room where James was located. A

<div style="float:left">United States District Court<br>For the Northern District of California</div>

1   hostage negotiator, Kim argues, could have attempted to reason with James to try to achieve a non-

2   violent resolution to the conflict.

3          Kim's argument that failure to deploy a SRT team and/or hostage negotiator constitutes

4   excessive force is unpersuasive.  The undisputed facts, even interpreted in the light most favorable

5   to Kim, indicates that James was unresponsive rather than combative, at least until the moment

6   officers broke down the door.  Unlike most barricade-type situations, the officers had a clear, close-

7   up view of James through the bedroom window.  Although they could not see his hands, they were

8   able to observe his behavior closely and did so for a period of time before putting any plan into

9   action.

10         Their assessment that James was not immediately violent and did not merit SRT deployment

11  led to tragic consequences, but that does not render the conclusion unreasonable under the

12  circumstances.  The fact that officers observed James at close range for a meaningful period of time

13  before deciding a call to the SRT team was not warranted, strongly suggests that their decision, from

14  the "on-scene perspective," was reasonable based on the facts then available to them.  *Graham*, 490

15  U.S. at 396.  Their conclusion that James was unresponsive and non-violent was further supported

16  by the fact that James failed to react in any way to the officers' commands and actions, even after

17  being shot in the legs three times by rubber bullets.  It was only when officers broke down the door

18  and deployed the K-9 unit that James sprung into action.  As in *Billington*, police officers made an

19  objectively reasonable decision that put in motion a very unfortunate chain of events.

20         Alternatively, Kim argues the officers' use of the canine constituted excessive force, citing

21  *Chew v. Gates*, 27 F.3d 1432, 1441 (1994) (noting that use of a canine trained to "bite and hold"

22  constitutes "severe" force).  Again, however, this argument is ultimately unpersuasive because it

23  was reasonable under the circumstances for the officers to allow the dog to precede them into the

24  bedroom as they broke through the door.  James was apparently conscious but not responding to the

25  officers' oral commands; he was known to be acting erratically, unpredictably, and dangerously; the

26  whereabouts of his knife were unclear; and the officers looking through the window could not see

27  his hands.  Indeed, had the police broken through the door *without* sending the canine in first (as

28

1  plaintiff's counsel orally argued they should have), the risk was high that one of the officers might

2  have been the first target of James's knife attack.  As such, even when the undisputed facts are taken

3  in the light most favorable to plaintiff, the defendants have not committed a constitutional violation,

4  and therefore they are entitled to qualified immunity—and summary judgment—on Kim's first

5  claim.

6  B.    Denial of Medical Treatment

7       Kim next argues that James's constitutional right to reasonable medical treatment was

8  violated.  "[T]he rights of those in police custody to receive medical treatment arise under the Due

9  Process Clause of the Fourteenth Amendment."  *Carnell v. Grimm*, 74 F.3d 977, 979 (1996).

10  "[P]ersons in custody [including pre-trial detainees] ha[ve] the established right to not have officials

11  remain deliberately indifferent to their serious medical needs."  *Id.*

12       Kim argues that witnesses had described James's erratic behavior at the party to the

13  defendants, and that they also knew from their own observations that he was unresponsive to rubber

14  bullets.  These factors, Kim contends, should have alerted defendants to the fact that James was

15  having a "serious medical emergency."  As if this was not enough, Kim argues, the fact that the

16  officers planned to have the dog bite James as a part of their contingency plan proves they foresaw

17  an injury, but yet did not arrange for medical backup to be on hand to treat the anticipated dogbite

18  injuries.

19       These arguments, however, are ultimately without merit.  James was not in custody at any

20  point before his death, and therefore there are no grounds to consider him a "pre-trial detainee" for

21  Fourteenth Amendment purposes.  Moreover, even assuming that his Fourteenth Amendment rights

22  did attach, the Ninth Circuit has held that no deliberate indifference claim will lie unless the lack of

23  medical treatment can be shown to be harmful.  *McGuckin v. Smith*, 974 F.2d 1050, 1060 (1992).

24  Here, James was killed instantly by a bullet to his head, and no on-site medical team could have

25  prevented it; he did not die from a dog bite or from whatever medical condition may theoretically

26  have made him behave erratically.  Thus, even when all inferences from the undisputed facts are

27  taken in the light most favorable to plaintiff, the defendants cannot be deemed to have committed a

28

No. C 09-00025 RS
ORDER

9

United States District Court
For the Northern District of California

1   constitutional violation based on the failure to provide medical treatment, and qualified immunity

2   for defendants covers Kim's second claim for denial of medical care.  Summary judgment in

3   defendants' favor is therefore warranted.

4   C.      Deprivation of Familial Relationship

5           Kim also argues that her own constitutional rights as an individual were violated by

6   defendants.  Both parents and children of a decedent have been found to have a constitutionally

7   protected liberty interest in their familial relationship under the Fourteenth Amendment.  *Curnow By*

8   *and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).  "It is well

9   established that a parent has a fundamental liberty interest in the companionship and society of his

10  or her child and that the state's interference with that liberty interest without due process of law is

11  remediable under 42 U.S.C. § 1983."  *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)

12  (citation, alterations, and internal quotation marks omitted).  The standard for such a violation is

13  based on substantive due process.  *See Moreland v. Las Vegas Metropolitan Police Dep't*, 159 F.3d

14  365, 371 (9th Cir. 1998).  To prevail on a Fourteenth Amendment claim arising out of the loss of a

15  familial relationship, a plaintiff must show that the defendants' conduct shocks the conscience.  *Id.*

16  at 372.  What state of mind shocks the conscience depends on the circumstances of a particular case.

17  *Id.*

18          Here, while there can be no question that the facts of this case are monumentally tragic, the

19  police officers' behavior and decisions cannot be said to shock the conscience.  As detailed above,

20  the officers were faced with a non-responsive but potentially armed person, who had already

21  stabbed two people only a few hours before and who was demonstrating erratic, unpredictable

22  behavior.  Their plan to use the Sage launcher to distract and/or injure James non-lethally, and then,

23  if that did not work, to use a canine to inflict non-lethal injuries that would enable him to be taken

24  into custody with minimal risk to all concerned, was objectively reasonable under the

25  circumstances.  Once that plan was put into action, and James responded by lunging at Fitzgerald

26  and Johnson in a confined space with a six-inch knife, from only 2-3 feet away, the officers' use of

27  deadly force to defend their own lives was also entirely justified.  As such, defendants did not

28

No. C 09-00025 RS
ORDER

10

1   violate Kim's constitutionally protected liberty interest in a continued relationship with her son.

2   Again, the first prong of *Saucier* has not been met, because no constitutional rights were violated.

3   Thus, summary judgment in favor of defendants is also appropriate on this claim.

4   D.   *Monell* Claim Against the City

5          Kim further levels a separate claim against the City based on its allegedly unconstitutional

6   practices and policies, as implemented against her son.  The claim is based on *Monell v. Dep't of*

7   *Social Servs. of the City of N.Y.*, which held that a plaintiff may state a civil rights claim against a

8   municipality under § 1983 by showing that he has suffered a deprivation of a constitutionally

9   protected interest and that the deprivation was caused by an official policy, custom or usage of the

10  municipality.   436 U.S. 658, 690-91 (1978); *Cornejo v. County of San Diego*, 504 F.3d 853, 855 n.4

11  (9th Cir. 2007).  Here, as set forth above, plaintiff cannot show the deprivation of a constitutionally

12  protected interest, and therefore her *Monell* claim cannot survive summary judgment.

13                          IV.   CONCLUSION

14         For the reasons stated above, defendants' motion for summary judgment is granted and

15  plaintiff's motion for partial summary judgment is denied.[3]  A judgment accompanies this order.

16

17         IT IS SO ORDERED.

18

19  Dated: 05/19/2010

20                                          _____
                                            RICHARD SEEBORG
21                                          UNITED STATES DISTRICT JUDGE

22

23

24

25  _____
    [3]  In light of this holding, the Court need not reach defendants' evidentiary objections and motion to
26  strike Kim's expert on *Daubert* grounds.  Kim has also filed a list of four evidentiary objections, but
    the disputes stated therein, even if decided in her favor, do not ultimately impact the holding of this
27  case.  Therefore, they also need not be addressed.

28
                                                                    No. C 09-00025 RS
                                                                    ORDER

United States District Court
For the Northern District of California

11